**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SAMER GANDOR,** )| |
| )| |
| **Plaintiff,** )| |
| )| **CIVIL ACTION** |
| **v.** )| |
| )| **NO. 4:13-40132-TSH** |
| **TORUS NATIONAL INSURANCE** )| |
| **COMPANY, d/b/a STATE NATIONAL** )| |
| **INSURANCE COMPANY** )| |
| )| |
| **Defendant.** )| |
| )| |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT (Docket No. 25)**

**October 15, 2015**

**HILLMAN, D.J.**

Plaintiff Samer Gandor ("Plaintiff") asserts claims against Torus National Insurance
Company, d/b/a State National Insurance Company ("Torus"), for breach of contract (Count I),
breach of the implied covenant of good faith and fair dealing (Count II), and violation of Mass.
Gen. Laws ch. 93A (Count III). Torus asserts a counterclaim for declaratory judgment. This case
arises out of Torus's refusal to defend and indemnify Plaintiff's previous attorneys for legal
malpractice under the terms of two professional liability insurance policies. Torus has moved for
summary judgment (Docket No. 25). For the following reasons, the motion is **_granted_**.[1]

---

[1] To the extent that Torus's counterclaim for declaratory relief raises claims broader than those
asserted in the counts of Plaintiff's complaint, this Court's decision on Torus's motion for
summary judgment is limited to the reasons set forth in this Memorandum and Order.

**Background**

Prior to 2010, Attorney Alan Shocket was a principal of the law firm Shocket & Dockser, LLP.  Shocket & Dockser employed as an associate attorney Adam Lowenstein, who mishandled a real estate litigation matter in Massachusetts Superior Court in 2009.  The client in that matter was the Plaintiff in this action, Samer Gandor.  In the underlying case, Lowenstein failed to comply with certain procedural requirements for appealing a zoning decision that was adverse to Gandor and his plans to renovate a building in Woburn.  Recognizing his error, Lowenstein agreed to dismiss the appeal with prejudice in September of 2009.  Lowenstein left Shocket & Dockser that same year.

In January of 2010, Alan Shocket dissolved Shocket & Dockser and formed a new firm called Shocket Law Office, LLC.  On January 12, 2010, shortly after leaving Shocket & Dockser, Lowenstein wrote a letter to Shocket in which he described the error he had made in handling Gandor's zoning appeal.  On January 22, 2010, Shocket sent a letter to Gandor in which Shocket communicated his opinion that Lowenstein's errors did not amount to malpractice.  Also in 2010, Torus issued a claims-made professional liability insurance policy to Shocket Law Office with a policy period of November 27, 2010 to November 27, 2011 (the 2010-11 Policy).[2]

In July 2011, Gandor filed a malpractice suit against Lowenstein and Shocket Law Office in Massachusetts Superior Court (the "Lowenstein Action") for Lowenstein's mishandling of the zoning appeal.  Upon learning of Gandor's malpractice action, Shocket Law Office filed a notice of claim with Torus on the 2010-11 Policy.  Torus denied coverage because, in part, Lowenstein was not named as an attorney under the policy, and the underlying conduct was subject to an

---

[2] As a "claims made" policy, the 2010-11 Policy applied only to claims made against the insured during the policy period. (Docket No. 28-4 at 2.)

exclusion.[3]   The Lowenstein Action settled in March of 2013.   As part of the settlement, Lowenstein and Gandor executed an Agreement for Judgment in the amount of $500,000, and Lowenstein assigned to Gandor any rights against Shocket, Shocket & Dockser, and Shocket Law Office.   The Superior Court entered a separate and final judgment against Lowenstein on March 13, 2013.

Two months later, Gandor filed suit in Massachusetts Superior Court against Alan Shocket individually (the "Shocket Action").   At the time, Shocket Law Office was covered by a claims-made malpractice insurance policy with a policy period of November 27, 2012 to November 27, 2013 (the 2012-13 Policy).   The complaint sought relief for Alan Shocket's failure to insure Lowenstein under his law firm's malpractice insurance policy.   Shocket Law Office filed a claim with Torus.   The insurer denied coverage again, noting that coverage could not be created by recasting a previously reported claim as "new and distinct."   To the extent that the claim offered the new allegation that Shocket had failed to insure Lowenstein, Torus found that the conduct was not covered.   Ultimately, the Shocket Action settled.   Just like in the Lowenstein Action, Shocket agreed to an entry of judgment in the amount of $500,000 and assigned to Gandor all rights to collect on the underlying judgments.

Gandor filed this action on November 13, 2013.   The complaint alleges that Torus breached the insurance contracts and the implied covenant of good faith and fair dealing by denying coverage (Counts I and II).   With respect to Torus's second denial of coverage, Gandor alleges that Torus erroneously applied the 2010-11 Policy instead of the 2012-13 Policy.   The complaint also alleges that Torus's coverage denials violate the Massachusetts Consumer Protection statute,

---

[3] An entity called North American Risk Services, Inc. ("NARS"), a third party administrator working on behalf of Torus, reviewed the claim and concluded that coverage was not available.

Mass. Gen. Laws ch. 93A (Count III).  Torus counterclaimed for declaratory judgment, seeking to establish that it properly denied coverage on both claims.

## Discussion

### *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A factual dispute precludes summary judgment if it is both "genuine" and "material."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986).  An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id.*

When there are no disputed issues of material fact, an insurance coverage dispute is a matter of law appropriate for resolution by summary judgment. *See Vermont Mut. Ins. Co. v. Zamsky*, 732 F.3d 37, 42 (1st Cir. 2013) ("[T]he interpretation of an insurance policy typically embodies a question of law for the court").  "Summary judgment for an insurance company is proper 'when the allegations in the underlying complaint lie expressly outside the policy coverage and its purpose.'" *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 403 (1st Cir. 2009) (quoting *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.,* 788 N.E.2d 522, 531 (Mass. 2003)) (quotation omitted).

### *Analysis*

Massachusetts law regarding the interpretation of insurance policies governs this diversity action. *See B&T Masonry Constr. Co., Inc. v. Pub. Serv. Mutual Ins. Co.*, 382 F.3d 36, 38 (1st Cir.

2004).  Insurance policies in Massachusetts are construed in accordance with general principles of

contract interpretation. *Id.* at 39.  Terms are given their ordinary meanings, *see Finn v. National*

*Union Fire Ins. Co. of Pittsburgh, Pa.*, 896 N.E.2d 1272, 1277 (Mass. 2008), and courts "consider

what an objectively reasonable insured, reading the relevant policy language, would expect to be

covered." *A.W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund*, 838 N.E.2d 1237, 1250

(Mass. 2005) (quoting *Trustees of Tufts Univ. v. Commercial Union Ins. Co.,* 616 N.E.2d 68, 72

(Mass. 1993)) (additional citation omitted).  When the insured party shows a possibility that a

claim falls within the coverage, the burden shifts to the insurer to show that an exclusionary

provision applies. *See Essex Ins. Co.*, 562 F.3d at 404.

"If free from ambiguity, an exclusionary clause, like all other provisions of an insurance

contract, must be given its usual and ordinary meaning." *Hakim v. Massachusetts Insurers'*

*Insolvency Fund*, 675 N.E.2d 1161, 1165 (Mass. 1997) (citing *Royal-Globe Ins. Co. v. Schultz,*

434 N.E.2d 213 (Mass. 1982).  However, exclusions from coverage are strictly construed, and any

ambiguity should be resolved in favor of the insured. *Id.*

*1.   Whether the 2010-11 Policy Covers Plaintiff's Claims*

Torus argues that coverage under the 2010-11 Policy is precluded by Exclusion II(B). That

exclusion precludes insurance coverage for:

> [A]ny CLAIM arising out of any WRONGFUL ACT occurring
> prior to the effective date of this policy if . . . *the INSURED at or*
> *before the effective date knew or could have reasonably foreseen*
> *that such WRONGFUL ACT might be expected to be the basis of a*
> *CLAIM.* However, this paragraph B does not apply to any
> INSURED who had no knowledge of or could not have reasonably
> foreseen that any such WRONGFUL ACT might be expected to be
> the basis of a CLAIM.

(Docket No. 28-4 at 25) (emphasis added.)  In interpreting similar language in a different

professional liability policy, the Massachusetts Appeals Court has held that this type of exclusion

"contains both subjective and objective elements"; the test is "what a reasonable attorney would foresee given the insured's knowledge." *TIG Ins. Co. v. Blacker*, 767 N.E.2d 598, 602 (Mass. App. Ct. 2002) (quoting *Carosella & Ferry, P.C. vs. TIG Ins. Co.,* 189 F.Supp.2d 249 (E.D. Pa. 2001)).

Here, the effective date of the 2010-11 Policy was November 27, 2010; Lowenstein's mishandling of Gandor's appeal occurred in 2009. Accordingly, the pertinent inquiry is whether Shocket (the insured) knew or could have reasonably foreseen, prior to November 27, 2010, that Lowenstein's mishandling of Gandor's appeal might be expected to be the basis of a claim. Several exhibits reveal that the answer to this question is decidedly affirmative.

On January 12, 2010, approximately ten months before the effective date of the 2010-11 Policy, Lowenstein wrote a letter addressed to "Alan Shocket, Esq., Shocket & Dockser, LLP," in which he stated:

> I am writing due to an outstanding matter that requires your attention. A case I handled for Sam Gandor had been dismissed [by stipulation] due to a fatal error I made when filing and serving the matter upon the defendant.
> . . .
> Sam was timely notified by me in writing of my mistake. I advised him that he should bring the property into compliance as soon as possible. He has since, following a letter from the city's attorney, attempted to file another application for a special permit. He was disallowed and told he has no recourse from the Building Department.
> . . .
> I apologize for this dilemma and for 'passing the buck,' however, given the current circumstances I have no choice. I believe Sam . . . will agree to drop any claim he has in negligent representation if assistance is offered him in resolving this matter.

(Docket No. 28-10 at 2-3.) Shocket then wrote a letter to Gandor, dated January 22, 2010, in which he stated:

> I received correspondence from Attorney Adam Lowenstein returning your file to me on this matter and informing me of the status of this case. . . . He states that he committed a "malpractice"

> in his handling of your appeal and therefore I should make
> arrangements to file a suit for declaratory judgment against the City
> of Woburn on your behalf in order to remedy the situation he
> created.  Upon review of the case file, I have concluded that he did
> not commit a malpractice and therefore I will not be pursuing any
> additional remedy against the City if Woburn on your behalf.
>
> In order for a malpractice to have occurred as with any tort, there
> must be injury to the client and the attorneys' actions must be the
> proximate cause of the clients' injury.  The injury here as stated by
> Attorney Lowenstein is incorrect in his assessment that any misstep
> by him caused you damage or that the [Zoning Board of Appeal]
> decision could have been overturned by the filing of the case in
> question.  No Superior Court lawsuit Attorney Lowenstein might
> have filed would have afforded the Superior Court jurisdiction to
> hear this case and decide it in your favor.
> . . .
> I understand your disappointment and therefore upon the execution
> of a release, I will agree to refund to you $1,036.00, which
> represents the legal charges you incurred for the time spent drafting
> and filing the appeal.

(Docket No. 28-11 at 2-3.)  In a deposition, Shocket was asked, regarding the above-mentioned

release, "And what was your purpose for seeking a release at that time?" to which he answered,

"My purpose in seeking a release at that time?  Clearly, [Gandor] was making a claim of

malpractice.  So I certainly wasn't going to provide him with any type of relief without receiving

a release." (Docket No. 28-3 at 11.)

Shocket and Gandor continued to communicate, and Gandor did not accept the release.  In

an email dated April 10, 2010, Gandor wrote to Shocket:

> I have not heard your reply as of yet, so far this is the situation, the
> city is issuing fines against the building and that adds tremendously
> to my losses, I cannot accept the technicality excuse you mentioned
> of a procedural error by the previous attorney[.]  I have spoken to
> several lawyers regarding this matter and had your letter reviewed.
>
> I need you to take up where we left off asap, a filing to remedy the
> zoning issues and stop the 1000.00 dollar a day they are fining me.

(Docket No. 28-17 at 2.)  These letters and Shocket's testimony show that he could have reasonably

foreseen—and actually did foresee—Gandor's malpractice claim, as early as January of 2010 and

certainly no later than April of that same year.  Therefore, the unambiguous language of Exclusion

II(B) applies.  The 2010-11 Policy did not cover Lowenstein's mishandling of Gandor's zoning

appeal.

### 2.  Whether the 2012-13 Policy Covers Plaintiff's Claims

In an attempt to salvage his claim, Gandor alleges that Torus erroneously applied the 2010-

11 Policy to the claim made by Shocket Law Office in 2013.  In response, Torus contends that (1)

the 2013 claim is governed by the terms of the 2010-11 Policy because the 2013 claim seeks the

same damages as the 2011 claim; and (2) to the extent that the 2013 claim seeks relief for Shocket's

failure to insure Lowenstein, the 2012-13 Policy does not provide coverage because such conduct

falls outside the policy's definition of "professional services."

The 2010-11 Policy provides the following regarding multiple claims:

> B.    Two or more CLAIMS arising out of a single WRONGFUL
> ACT or a series of related WRONGFUL ACTS shall be
> treated as a single CLAIM.

> C.    All such CLAIMS whenever made shall be considered first
> made on the date on which the earliest CLAIM arising out
> of such WRONGFUL CONDUCT was first made and all
> such CLAIMS are subject to the same limits of liability and
> deductible.

(Docket No. 28-4 at 26.)[4]  The first claim at issue was the Lowenstein Action, filed in 2011, in

which Gandor sought damages for Lowenstein's failure to comply with certain procedural

requirements for appealing an adverse zoning decision. (Docket No. 28-12.)  This claim resulted

in a $500,000 judgment against Lowenstein.  In the second claim, the Shocket Action, Gandor (on

---

[4] The 2012-13 Policy contains a clause with nearly identical language. (Docket No. 28-5 at 39.)

behalf of Lowenstein) brought suit against Shocket in 2013, seeking damages for Shocket's failure to provide professional liability insurance to Lowenstein to cover the first claim. (Docket No. 28-13.)  The wrongful conduct underlying these two claims is identical.  Lowenstein's mistakes regarding Gandor's zoning appeal in 2009 resulted in the damages for Gandor's loss, and these same damages formed the basis of the second claim.  Framing the second claim as Shocket's failure to provide insurance for Lowenstein after he left the firm does not change the fact that the underlying wrongful conduct and resulting damages were those set forth in the first claim.  Thus, according to the language of both the 2010-11 and 2012-13 Policies, the second claim is considered to have been made alongside the first one.  The 2010-11 Policy was the appropriate instrument, and Exclusion II(B) applies to the second claim as well as the first.  Coverage was appropriately denied.

Moreover, even if the second claim were construed as stemming from separate conduct occurring after the first claim had been made, the nature of the second claim is beyond the scope of the 2012-13 Policy.  The 2012-13 Policy covers only claims that "Arise[] out of the performance or failure to perform any **Professional Service**." (Docket No. 28-5 at 21.)  Professional services are defined as "services to others by an **Insured** as . . . An attorney . . . ." (Docket No. 28-5 at 31.)

In deciding "whether a particular act of a person who practices a profession has the character of a professional service," Massachusetts courts have emphasized those acts that require "specialized knowledge and skill that is acquired through rigorous intellectual training." *Reliance Nat. Ins. Co. v. Sears, Roebuck & Co.,* 792 N.E.2d 145, 147 (Mass. App. Ct. 2003) (citing *Roe v. Federal Ins. Co.,* 587 N.E.2d 214, 217 (Mass. 1992)).  The professional aspect of the practice of law "involves the rendering of legal advice to and advocacy on behalf of clients," while "the commercial aspect involves the setting up and running of a business, including such tasks as

securing office space, hiring staff, paying bills, and collecting on accounts receivable." *Id.* at 148 (quoting *Visiting Nurse Assn. of Greater Philadelphia v. St. Paul Fire & Marine Ins. & Co.*, 65 F.3d 1097, 1101 (3d Cir. 1995)) (internal quotation marks omitted).  Here, the conduct at issue in the second claim was commercial rather than professional.  Shocket's decisions regarding the terms of his former employee's professional liability coverage were not the result of rigorous intellectual training; these decisions pertained to the running of a business rather than the practice of law.  Therefore, even if the second claim were considered under the 2012-13 Policy, Torus properly denied coverage.

### 3.   *Chapter 93A*

As explained above, Torus properly denied coverage for the two claims at issue in this case.  There was no violation of Mass. Gen. Laws ch. 93A.

### <u>Conclusion</u>

For the foregoing reasons, Defendant's motion for summary judgment (Docket No. 25) is ***<u>granted</u>***.  Judgment shall enter for Defendant.


**SO ORDERED.**


                                                        <u>/s/ *Timothy S. Hillman*</u>
                                                        **TIMOTHY S. HILLMAN**
                                                        **DISTRICT JUDGE**